AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

| LODGED | |
| --- | --- |
| CLERK, U.S. DISTRICT COURT | |
| 04/09/2020 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ dlo _____ DEPUTY | |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED | |
| --- | --- |
| CLERK, U.S. DISTRICT COURT | |
| 4-9-2020 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ SP _____ DEPUTY | |

United States of America

v.

CHELSA COLLIER,

　　　　　　　Defendant.

Case No.　**2:20-mj-01596**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 8, 2020 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 841 | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/S/ MARLON CORONADO*
*Complainant's signature*

_____
MARLON CORONADO, DEA TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:　　　　4/9/20

_____
*/S/ CHARLES F. EICK*
*Judge's signature*

City and state:　Los Angeles, California

Hon. Charles Eick, U.S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Marlon Coronado, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1. This affidavit is made in support of a criminal complaint against CHELSA COLLIER ("COLLIER") for a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).

2. This affidavit is also made in support of an application for a warrant to search a black iPhone and a ZTE cellular telephone (the "SUBJECT DEVICES"), in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in draft form, in substance, and in part only.

## II. BACKGROUND OF AFFIANT

5.    I have been a Los Angeles Airport Police Department ("LAXPD") Officer since June 2004.  I have been assigned to the DEA as a sworn Task Force Officer ("TFO") since July 2015.  I am currently assigned to the DEA Los Angeles Field Division, Los Angeles International Airport Narcotics Task Force ("LAXNTF").

6.    The LAXNTF is an inter-agency task force based at the Los Angeles International Airport ("LAX").  In addition to the DEA, the LAXNTF consists of the following agencies: the Los Angeles World Airports Police Department, the Los Angeles Police Department, and the Los Angeles County Sheriff's Department. The LAXNTF also works closely with the United States Customs and Border Protection, the Transportation Security Administration ("TSA"), the Department of Homeland Security, and the Federal Bureau of Investigation.  All of the aforementioned agencies recognize the need for a coordinated law enforcement effort to target airport/airline internal criminal enterprises that use the aviation system to transport large amounts of illicit drugs throughout the United States, and throughout the world.

7.    Specifically, the LAXNTF is focused on investigating airport/airline internal conspiracies in which criminal enterprises recruit airport/airline employees to exploit their privileged airport access and knowledge of existing airport security procedures, as well as airline passengers smuggling

drugs and drug proceeds through the airport.  Previous and current investigations have identified Transnational Criminal Organizations ("TCOs") that rely generally on drug trafficking as their primary source of revenue.  As such, TCOs require the use of various forms of transport in order to obtain and distribute large amounts of illicit drugs into and through the United States, and air travel provides a significant opportunity for them to do so.  Additionally, air travel provides an opportunity to smuggle and distribute other contraband, including drug proceeds.

8.    During my career, I have participated in a variety of drug investigations ranging from simple possession to complex international conspiracies.  I have also participated in the execution of search warrants, conducted physical surveillances, reviewed video surveillance, spoken to confidential informants, interviewed suspects, and discussed drug investigations with other experienced drug investigators concerning the methods and practices utilized by drug traffickers.

9.    From June 2014 through June 2015, I was assigned to Homeland Security Investigations ("HSI") as a TFO.  While assigned to HSI, I participated in several drug investigations, involving the unlawful importation, exportation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, and the conducting of monetary transactions involving the proceeds of specified unlawful activities.

10.   Based on my training and experience, I am familiar with the methods of operation of narcotics traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well as the collection of money proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds. I am also familiar with the methods of operation used by people who distribute controlled substances, including the distribution, storage and transportation of controlled substances, as well as the collection of proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.

### III.  SUMMARY OF PROBABLE CAUSE

11.   On April 8, 2020, Transportation Security Administration ("TSA") officers and LAXPD found approximately 1.02 kilograms (including packaging) of Fentanyl, approximately 0.03 kilograms (including packaging) of Acetaminophen pills and 3.35 kilograms (including packaging) of marijuana inside a suitcase that had been checked into Delta Airlines under COLLIER's name, who was scheduled to take a Delta flight from LAX to Indianapolis, Indiana, with a layover in Detroit, Michigan.  Following the discovery of the narcotics, COLLIER was arrested, and the SUBJECT DEVICES were seized.

### IV. STATEMENT OF PROBABLE CAUSE

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

4

**A.    Discovery of Fentanyl in Collier's Roller Bag**

13.  Based on my review of an April 8, 2020, LAXPD report
written by LAXPD Officer Victor Santana and my conversations
with TSA agent Dominick Wilson and LAXPD Officers Renard and
Santana, I know the following:

a.    On April 8, 2020, at approximately 11:10 a.m., an
Explosive Detection System alarm in a TSA luggage screening room
alerted a TSA agent to an anomaly inside a pinked colored roller
bag (the "roller bag").

b.    After the alarm sounded, a TSA agent, viewing an
X-ray monitor, saw an anomaly in the roller bag that appeared to
be a "non-rigid sheet."  The TSA agent moved the roller bag to
an inspection table, opened the roller bag, and searched for the
"threat item."  Once the TSA agent opened up the bag he
immediately discovered several vacuum sealed packages containing
a green leafy substance.  One of the vacuum sealed packages
containing the green leafy substance also contained a small
plastic bag containing blue colored pills.  The TSA agent then
continued to search for the threat item and discovered a brown
colored vacuum sealed package underneath several miscellaneous
items of clothing.  The TSA agent then conducted an explosive
trace swab on the brown colored vacuum sealed package which
returned negative for explosives.  The TSA agent then alerted
his supervisor, and the supervisor contacted LAXPD.

c.    At approximately 11:25 a.m., LAXPD officers
Renard and Santana arrived at the TSA luggage screening area.
Officers Renard and Santana observed a TSA bomb appraisal

officer also testing the brown colored vacuum sealed package for explosives which returned a negative result.

        d.    Officer Renard then removed seven vacuum sealed packages containing a green leafy substance which was consistent with marijuana.  Officers Renard and Santana observed that one of the vacuum sealed packages containing the green leafy substance also contained a small bag containing blue colored round shaped pills which were imprinted with the letter "M."

        e.    The roller bag had a Delta Airlines luggage tag bearing COLLIER's name and Delta Airlines Flight Numbers 1242 from LAX to Detroit, Michigan, then to Indianapolis, Indiana[1].

        f.    LAXPD plain clothes officers responded to gate 23 where they made with a Delta Airlines ticket agent who flagged COLLIER's boarding ticket.  Delta Airlines agent advised COLLIER that the LAXPD plain clothes officers needed to speak with her as she attempted to board the flight.  COLLIER then walked over to the LAXPD plain clothes officers who asked her if she was "Chelsa Collier" and she replied "yes."  LAXPD plain clothes officers then advised COLLIER that that they needed to speak

---

[1] Based on my knowledge and experience of Delta Airline's standard practices at LAX, the passenger whose name is on the ticket and baggage tag must be physically present and provide a valid photo identification matching their name and date of birth on the reservation in order to check a bag or suitcase, at which point that passenger's name (and not someone else's) will be printed on the bag tag that is then immediately affixed to the bag or suitcase.  The identification of Collier's name on the suitcase, in my experience, therefore means that Collier checked the suitcase in person with Delta Airlines upon arriving at the airport.  Delta Airlines then typically takes custody of the bags or suitcases from the ticketed passenger, making it highly unlikely that someone else removed the tag from the suitcase and placed it on a different suitcase after Collier checked it in.

with her regarding her checked luggage.  LAXPD officers then asked COLLIER for her identification, who produced an Indiana Identification.

g.   LAXPD Officers Renard and Santana responded to gate 23 to speak with COLLIER.  Officer Santana asked COLLIER a series of preliminary investigative questions.  Officers Renard and Santana along with COLLIER were standing in an open area near gate 23 and COLLIER was not handcuffed.

h.   Officer Santana asked COLLIER for her name and she replied "Chelsa."  COLLIER then stated the following, among other things:

i.   COLLIER had been in Los Angeles visiting her brother for a couple of weeks.  COLLIER had been renting an Air B&B in Los Angeles but could not provide the exact location.

j.   On April 7, 2020, COLLIER purchased her own one-way ticket from LAX to Indianapolis with her own credit card.

k.   On April 8, 2020, COLLIER packed her own roller bag and no one else had possession of her bag until she checked in the roller bag with Delta Airlines.  COLLIER described her roller bag as pink in color.

l.   On the same date, COLLIER said she missed her original flight at 6 a.m., so she took an Uber back to her Air B&B rental and returned to LAX prior to her rescheduled flight.  COLLIER alleged that there was no other items in her bag besides her clothing.  Officer Santana advised COLLIER that there were several vacuum sealed bags containing a green leafy substance

inside of her roller bag and COLLIER said "I have no idea how that would get in there."

14.   At approximately 11:59 a.m., Officer Santana placed COLLIER under arrest and read her "Admonition of Rights." COLLIER invoked her Miranda Rights and stated "I don't want to say anything."

15.   At approximately 12:05 p.m., I, LAXNTF member TFO Marlon Coronado, responded to the baggage room, where I met with LAXPD Officer Porsha King who was standing by with the roller bag and narcotics.  I observed next to the pink colored roller bag the following: two kilogram size packages containing a white powdery substance which were vacuum-sealed within the same package.  One of the two packages was labeled as "Nazi."  I then observed seven vacuum sealed packages which contained a green leafy substance.  One of the vacuum sealed packages contained a plastic bag containing blue colored round pills labeled with the letter "M".  A second vacuum sealed package also contained a black colored sock which containing a white colored brittle like substance.  I then took custody of the roller bag and the narcotics.  LAXPD Sergeant Todd Edwards and I transported the roller bag and narcotics to the LAXNTF office.  At approximately 12:25 P.M., LAXPD Officers Renard and Jeremy Eleazar transported COLLIER to the LAXNTF office.  At the LAXNTF office, Special Agent Davis King and I took custody of COLLIER and processed the roller bag and narcotics as evidence.

16.   While at the LAXNTF office, I, as witnessed by TFO Michael Woodard read COLLIER her Miranda Rights.  COLLIER

invoked her rights and refused to initial and sign the DEA
Miranda Rights form.

**B.    The package in COLLIER'S bag test positive for
Fentanyl**

17.  At the LAXNTF office, I tested two kilogram size
packages which were vacuum-sealed together in the same package.
Utilizing the TruNarc Raman spectrometer, I found the first
package, which was labeled as "Nazi" and contained a white
powdery substance, tested positive for Fentanyl.  I then tested
the second package which also contained a white powdery
substance which returned as Inconclusive.  I then tested the
blue colored pills which returned positive for Acetaminophen.  I
also tested white colored brittle like substance which was
inside of a small plastic bag which it returned Inconclusive.  I
determined that the seven vacuum sealed packages which contained
a green leafy substance, based on my training and experience,
contained marijuana.

**C.    Seizure of the Subject Devices**

18.  LAXPD Officer Santana discovered the SUBJECT DEVICES
inside of COLLIER'S pink colored purse during an inventory
search.  LAXPD Officers Eleazar and Renard transported the
SUBJECT DEVICES to the LAXNTF Office, where I took possession of
it.

**V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES**

19.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

20.    As used herein, the term "digital device" includes the SUBJECT DEVICE.

21.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

11

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a short period of time for a number of reasons, including the following:

       a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

       b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

24.  For all of the reasons described above, there is probable cause to believe that COLLIER has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __9th_ day of
_April____, 2020.


_____/S/ CHARLES F. EICK_____
THE HONORABLE CHARLES EICK
UNITED STATES MAGISTRATE JUDGE